RECEIVED

FEB - 2 2005

ROBERT H. SHEMWELL, CLERK
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE, LOUISIANA

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE/OPELOUSAS DIVISION

| | |
|---|---|
| **LAWRENCE REBARDI, III** | **CIVIL ACTION NO: 03-1776** |
| **VERSUS** | **JUDGE: MELANCON** |
| **CENTRAL BOAT RENTALS, INC.** | **MAGISTRATE JUDGE: HILL** |

## MEMORANDUM IN SUPPORT OF MOTION TO CONTINUE

**MAY IT PLEASE THE COURT:**

This matter involves a suit filed on behalf of Lawrence Rebardi, III against his employer, Central Boat Rentals, Inc., to recover damages under the Jones' Act and the General Maritime Law for injuries suffered by Mr. Rebardi while he was in the course and scope of his employment with Central Boat Rentals as a deckhand and member of the crew assigned to the "Miss Kerrilyn," a vessel operating in the navigable waters of the United States on the date of Mr. Rebardi's injuries, April 27, 2003. In addition, plaintiff seeks maintenance and cure from his employer as well as compensatory damages and reasonable attorney's fees for his employer's failure to provide him with complete maintenance and cure.

Mr. Rebardi's injuries occurred, again on April 27, 2003. Suit was filed on behalf of Mr. Rebardi on September 23, 2003. A Scheduling Order was issued on November 29, 2003, and trial was scheduled for March 21, 2005.

As the record will reflect, the plaintiff presented an unopposed motion on August 19, 2004 for leave of Court to extend certain deadlines, including the deadlines for the parties to exchange expert reports. In that motion, plaintiff requested, with defendant's agreement, that plaintiff be given

an additional thirty (30) days within which to present his expert reports, extending the deadline from the end of August to the end of September and that defendant's deadline then be extended thirty (30) days from the end of September to the end of October. Those extended deadlines would have still had the defendant in possession of the plaintiff's expert reports approximately five and three-fourths (5 3/4) months before trial.

Without giving reasons, the Court declined to extend the deadlines for exchanging expert reports. As both sides have been working together of various aspects of trial preparation including discovery, counsel for plaintiff approached counsel for the defendant and proposed a "gentleman's agreement" to exchange expert reports per the proposed extended deadlines even though the Court had declined to formally accept those extended deadlines. On August 30, 2004, counsel for the defendant accepted the proposed "gentleman's agreement". (See Exhibit A & B attached) Consistent with that agreement, on September 28, 2004, counsel for plaintiff provided counsel for defendant with reports from plaintiff's three (3) non medical experts. (See Exhibit C.1.)

Also consistent with the "gentleman's agreement" between the parties, counsel for the defendant did not provide counsel for the plaintiff with updated reports from defendant's medical expert, Dr. Sinac, until mid October, after the actual Scheduling Order deadline for exchange of defendant's expert reports. (See Exhibit C.2.) Despite that, the Court should note that counsel for plaintiff has raised no objection to the timeliness of the production of those reports.

Plaintiff would note to the Court that plaintiff's vocational expert, Glenn Hebert, was not able to prepare a finalized, definitive report as Mr. Rebardi's medical care was still progressing, and Mr. Hebert did not know whether Mr. Sullivan might ultimately need surgery and, if so, what his final prognosis or physical restriction/disabilities might be upon attainment of maximum medical

improvement. Because Mr. Hebert had not been able to provide final opinions concerning Mr. Rebardi's potential return to work capabilities, the economic analysis performed by plaintiff's economic expert, Dr. Womack, was also preliminary and contingent upon receipt of final return to work assumptions from Mr. Hebert. (See Exhibits C.3 & C.4.)

Plaintiff's injuries were primarily to his right shoulder, neck and low back. Mr. Rebardi's orthopedic treating physician is Dr. John Cobb who initiated treatment on June 18, 2003. On August 20, 2003 Dr. Cobb recommended an anterior repair of the right shoulder. He also recommended diagnostics for the lower back including a discogram a target at L4-5 with a control at L3-4. (See Dr. Cobb's records attached in globo as Exhibit E.)

At the request of the defendant, Mr. Rebardi underwent an Independent Medical Evaluation by Dr. Sinac on October 29, 2003. Dr. Cobb performed surgery on Mr. Rebardi's right shoulder on November 4, 2003. At the same time, he performed diskography targeting L4-5 with control at L3-4. Post operatively, Mr. Rebardi had some relief of some right shoulder complaints but continued to have complaints of significant lumbar pain. The discogram was normal at both levels L4-5 and L3-4. (See Exhibit E.)

During 2004, Mr. Rebardi continued to treat with Dr. Cobb for both his right shoulder and low back. On March 24, 2004, Dr. Cobb noted that he had targeted the L3-4 and L4-5 levels "because of the significant degenerative changes that he had, namely the Schmorl's node and facet changes." Dr. Cobb further noted that at L5 - S1, diagnostic testing demonstrated some bulging, but that this level was not studied at the time of the discogram. Based upon Mr. Rebardi's continued symptoms which over time began to present a suggestion of an S1 problem, Dr. Cobb recommended a diskography at L5-S1 for completeness. (See Exhibit E.)

Although the defendant paid both maintenance and cure benefits associated with Mr. Rebardi's injury to his shoulder, the defendant refused to pay any maintenance or cure benefits associated with Mr. Rebardi's low back injury. As such, the defendant refused to pay for Dr. Cobb's recommended diskography at the L5-S1 level.

Mr. Rebardi had that discogram at the Greater New Orleans Surgery Center on October 6, 2004. The discogram was performed by Dr. Bernard Landry and was positive at L5-S1. A post discographic CT scan showed an endplate disc herniation of the superior aspect of the L4 vertebral body. Annular displacement showed effacement of the ventral thecal sac. Dr. Landry's impression was a posttraumatic change of the L4 with endplate fracture, as well as an endplate disc herniation at the superior endplate of L4. He also noted pars fractures at L4 bilaterally, with facet arthropathy described. (Records of G.N.O.S.C. and Dr. Landry attached as Exhibit F.)

Mr. Rebardi returned to see Dr. Cobb who, in early November of 2004, recommended a posterior approach discectomies and stabilization with transforaminal lumbar interbody fusion procedures with Stryker fixation at L3-4 and L4-5. Mr. Rebardi saw Dr. Munshi, a neurosurgeon, on December 16, 2004 for a second opinion. Dr. Munshi agreed with Dr. Landry's interpretation of a discogram and post discographic CT. Dr. Munshi felt that Mr. Rebardi would benefit from an L3-4, L4-5 replacement of the disc with pedicle screws. (See report of Dr. Munshi attached as Exhibit G.)

Mr. Rebardi has now decided to proceed with the surgery recommended by Dr. Munshi. That surgery is currently scheduled to take place on February 7, 2005. Because the defendant had declined to pay any maintenance and/or cure benefits associated with Mr. Rebardi's back injury, Mr. Rebardi will be responsible for funding that surgery himself.

Again, this matter is scheduled for trial on March 21, 2005. Given the fact that Mr. Rebardi will be approximately two (2) months post lumbar surgery at the time of the trial, plaintiff would respectfully request that the trial of this matter be continued to be reset at a time sufficiently advanced into the future so as to allow him to attain maximum medical improvement post surgery. Upon attainment of maximum medical cure, Mr. Rebardi's treating physician, Dr. Munshi, would be in a position to give not only a prognosis but work related restrictions and/or disability. With that information, Mr. Rebardi's vocational expert will be in a position to adequately evaluate Mr. Rebardi's post accident/post surgery ability to return to work. With that information, Mr. Rebardi's economist will be in a position to calculate not only Mr. Rebardi's past wage loss, but the impact Mr. Rebardi's injuries and surgery have had on his future ability to work and earn income and to quantify that impact. As of this date, any efforts by Mr. Rebardi's treating physician, vocational expert and/or economic expert in these areas would be speculative.

Of course, plaintiff does not need to remind the Court that as a Jones' Act seaman, Mr. Rebardi is a ward of this Court. The justification for making Jones' Act seaman wards, of course is no more evident than in a case such as Mr. Rebardi. The only training Mr. Rebardi, a special education, tenth (10th) grade drop-out, received came in two (2) forms. The first, during the hiring process, involved providing Mr. Rebardi with several sheets of training material which he was told to read and then to sign to indicate that he had read it. One of those documents, addressing how to ascend and descend ladders versus stairs (one of the liability issues presented in this case) speaks of governmental regulations and contrasting angles/degrees of inclinations, phrases and concepts which Mr. Rebardi could not have possibly understood and which gave little guidance when presented in a sterile office environment. (See Exhibit H.) A second form of training (using that term loosely)

Mr. Rebardi received was watching other people work aboard the vessel to which he was assigned. He has testified in his deposition that he was descending the set of stairs down which he ultimately fell the way he had seen other crew members descend those stairs.

The stairs in question, is reflected by the attached photographs, (See Exhibit I in globo), are extremely steep and would, in fact, be in violation of any applicable land based standards; however, because these stairs are on a vessel in navigation, the defendant would have the Court believe these stairs do not render the vessel unseaworthy as they are common in a maritime setting. It is these kinds of risks to which a Jones' Act seaman is exposed on a daily basis that has justified making them wards of the Court. As wards of the Court, the Court is to protect Jones' Act seamen from the perils of the sea which are inherent in their employment, from the actions of a vessel/employer who fails to provide them with a safe place to work and <u>even from themselves</u>.

Mr. Rebardi is a product of a significantly dysfunctional and broken family. While in school he was part of the "special education" program and left school without completing the tenth (10th) grade. He is essentially illiterate with minimal reading skills and even less cognitive ability.

At the time of the accident which is the subject matter of this litigation, he was engaged to be married. During the early time frame after his accident, Mr. Rebardi's primary support system was his fiancé; however, because of problems, financial and personal, resulting from Mr. Rebardi's injuries, he and his fiancé are no longer engaged and have separated. The net effect of this is that Mr. Rebardi now has absolutely no support system. He gets minimal, if any, help from his family. He gets no help whatsoever from his former fiancé and is now estranged from his daughter by his former fiancé.

Since the breakup with his fiancé and the loss of what little support system he had through that fiancé, during the fall of 2004, Mr. Rebardi began to experience significant depression resulting from his persistent pain, his inability to work and all the sequella associated with those problems. During this time frame, counsel for Mr. Rebardi has experienced inordinate difficulty (1) locating Mr. Rebardi (he has floated from one address to another as he has no family home to return to nor finances to provide himself with his own home), (2) communicating with Mr. Rebardi (he has no phone), (3) scheduling and coordinating medical treatments/appointments and (4) getting Mr. Rebardi to come to his counsel's offices to work on his case. Counsel for plaintiff acknowledges Mr. Rebardi has missed appointments for a supplemental independent medical evaluation and appointments for vocational evaluations. On some of those occasions, Mr. Rebardi simply failed to remember the appointments. On other occasions, counsel for plaintiff were unable to locate Mr. Rebardi to advise him of the appointments. (See Exhibits J & K.) Finally, and most recently, Mr. Rebardi failed to attend an appointment because he had a conflicting appointment to see Dr. Munshi in an effort to address his medical problems so as to hopefully improve his quality of life and thereby diminish his depression so as to eliminate the possible risk of suicide and/or violent conduct, both of which Mr. Rebardi has expressed an inclination toward.

Mr. Rebardi, through lack of education, lack of family support and lack of adequate medical treatment provided by his employer has become his own worst enemy. At one point, after missing repeated medical appointments (with his own medical doctors as well as with doctors chosen by the defendant), and failing to keep appointments with his own attorney as well as with defendant's vocational expert, undersigned confronted Mr. Rebardi for an explanation. Mr. Rebardi inarticulate

explanation was, in effect, that nothing mattered, and that he had no hope because he had no money, couldn't work, had no place to live and no future.

Even with his pessimism, as a ward of the Court, Mr. Rebardi should be allowed a fair opportunity for "his day in Court". As indicated previously, Mr. Rebardi is scheduled to undergo lumbar surgery (at his cost) to hopefully reduce, if not eliminate his lumbar pain. He has just started receiving psychiatric counseling and medication beginning in December 2004; (See Exhibit L) again, at his cost. This is the first time Mr. Rebardi has requested a continuance of this Court. As a ward of this Court, both justice and circumstances require the trial be continued, that a new Scheduling Order be issued and that the trial be scheduled in the last quarter of 2005 as to allow Mr. Rebardi sufficient time post surgery to determine what his future will hold physically, vocationally, and economically and then present that future, along with the rest of his case, to the trier of fact.

Finally, plaintiff would request that the matter be continued so that he can file a Motion to Compel against the defendant in order to obtain numerous trial exhibits the defendant has failed to produce. Specifically, on August 29, 2003 counsel of plaintiff propounded a set of Interrogatories and Request for Production to the defendant. It was not until May 17, 2004 that the defendant answered those Interrogatories (defendant's Answers to Interrogatories and Request for Production of Documents are attached hereto as Exhibit L). Plaintiff would note that the defendant failed to produce his safety and operating rules (Interrogatory No. 7) the vessels crew list including last known address, telephone number and social security number (Request No. 1), the insurance policy insuring Central Boat Rentals, Inc. and the vessel (Request No. 8), the company's safety manual (Request No. 14) oil company's safety meeting reports (See Request No. 15). In response to Request No. 11, asking for daily reports and/or work logs, the defendant answered, none, despite the fact that

in defendant's Initial Disclosures they identify vessel logs as one of the exhibits they intend to introduce (See Exhibit M).

Counsel for plaintiff has requested the above referenced documents in writing twice (See Exhibit N.1 & Exhibit N.2). Counsel for plaintiff also verbally requested the above referenced documents at the deposition of one of the defendant's employees, Brian Blanchard. To date, none of those documents have been produced.

In addition, on January 30, 2004, plaintiff propounded a second set of Interrogatories and Request for Production of Documents to the defendant. (See Exhibit O.) To date the defendant has not responded at all to this discovery. Finally, on October 14, 2004, plaintiff propounded a Supplemental Request for Production of Documents to the defendant. (See Exhibit P.) To date, the defendant has not responded to this outstanding discovery.

Therefore, for all of the reasons set forth in this Memorandum in Support of Plaintiff's Motion for a Continuance, plaintiff would respectfully request that the Court continue the current, pending trial date of this matter, March 21, 2005, and reset this for trial no sooner than the third (3rd) quarter of this year with a new Scheduling Order to be issued in conjunction with a new trial date.

Respectfully Submitted,

**BOB BROUSSARD, A PROFESSIONAL LAW CORPORATION**

**BOB BROUSSARD, Bar Roll # 1267**
**CRAIG W. MARKS, Bar Roll #8923**
BOB BROUSSARD, APLC
400 East Kaliste Saloom, Suite 8200
Post Office Drawer 80827
Lafayette, Louisiana 70598-0827
Telephone: (337) 232-3333

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a copy of the above and foregoing has been served on all counsel of record in this proceeding by:

( ) Hand Delivery      (✓) Prepaid U.S. Mail

( ) Facsimile      ( ) Airborne Express

Lafayette, Louisiana, this __2__ day of __Feb__, 2005.

_____
**BOB BROUSSARD**
**CRAIG W. MARKS**